**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| TRAVIS W. KRONTZ, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:17-CV-305-PRC |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Deputy Commissioner for Operations, | ) | |
| Social Security Administration, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Travis W. Krontz on July 19, 2017, and on a Social Security Opening Brief of Plaintiff [DE 17], filed on January 9, 2018. Plaintiff requests that the Court reverse the July 22, 2016 decision of the Administrative Law Judge denying him disability insurance benefits and remand for further proceedings. On March 16, 2018, the Commissioner filed a response, and Plaintiff filed a reply on April 2, 2018. For the following reasons, the Court grants Plaintiff's request for remand.

## PROCEDURAL BACKGROUND

On May 30, 2014, Plaintiff Travis W. Krontz filed an application for disability insurance benefits, alleging disability beginning March 14, 2011, which was later amended to January 8, 2013.[1] The claim was denied initially and on reconsideration. On May 12, 2016, a hearing was held before Administrative Law Judge ("ALJ") Terry Miller. Present at the hearing were Plaintiff, his attorney, and an impartial vocational expert. The ALJ issued a written decision on July 22, 2016, concluding that Plaintiff was not disabled based on the following findings:

---

[1] Plaintiff's prior application for benefits was denied by a different administrative law judge on January 7, 2013. Plaintiff's request for review of that decision was denied by the Appeals Council on January 15, 2014, and Plaintiff did not file a civil action for judicial review.

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.      The claimant has not engaged in substantial gainful activity since January 8, 2013, the amended alleged onset date.

3.      The claimant has the following severe impairments: history of ileocolonic Crohn's disease, status post history of surgical resections (Ex. B1F, B4F, B5F, B8F, B16F, B20F, B21F, B23F, B24F, B25F); history of kidney stones, status post placement of left ureteral stent in April 2014 (Ex. B2F, B9F, B10F, B11F); and osteoarthritis of the spine (Ex. B3F).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform "light" work as defined in 20 CFR 404.1567(b) (i.e. lifting, carrying, pushing, and pulling up to 20 pounds occasionally and 10 pounds frequently; can sit at least up to six out of eight hours during an eight hour workday; and can stand/walk, in combination, at least up to six out of eight hours during the eight hour workday), except he needs a sit/stand option (which allows for alternating between sitting and standing up to every 30 minutes, if needed, but the positional change will not render the individual off task); only occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; and never climbing ladders, ropes, or scaffolds.

6.      The claimant is unable to perform any past relevant work.

7.      The claimant was born [in 1981] and was 32 years old, which is defined as a younger individual age 18-49, on the amended alleged disability onset date.

8.      The claimant has at least a high school education and is able to communicate in English.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

> 11. The claimant has not been under a disability, as defined in the Social Security Act, from January 8, 2013, through the date of this decision.

(AR 255-65).

Plaintiff then sought review before the Agency's Appeals Council, which denied his request on May 15, 2017, leaving the ALJ's decision as the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000);

*Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that [a reviewing court] may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and [the] conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. § 404.1520(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If no, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if no, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's residual functional capacity (RFC), age, education, and experience? If yes, then the claimant is not

disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(I)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's RFC. The RFC "is an administrative assessment of what work-related activities an individual can perform despite [his] limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 885-86; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

### MEDICAL EVIDENCE RELATED TO PLAINTIFF'S CROHN'S DISEASE

Plaintiff was thirty-one years old on the amended alleged onset date. Plaintiff suffers from severe ileocolonic Crohn's disease, which was originally diagnosed when he was a teenager. (AR 690). When he was fifteen years old, Plaintiff underwent an ileal and cecal resection surgery. *Id*. In 2006, when he was twenty-five years old, Plaintiff underwent ileocolic anastomotic revision resection due to recurring Crohn's disease. (AR 966). Subsequently, Plaintiff was treated with Remicade through October 2011, but, because he was not responding to Remicade, he was switched to Humira and methotrexate. (AR 690). On November 30, 2011, Plaintiff underwent a colonoscopy that showed severely stenosed end-to-side ileocolonic anastomosis with congestion and ulceration. (AR 690, 1133).

On February 23, 2012, Plaintiff presented to the emergency room with abdominal pain and a history of chronic abdominal pain. (AR 657). As of February 29, 2012, Plaintiff was taking Humira and methotrexate. *Id*. Plaintiff reported that he had significant improvement on this therapy, that he

had an average of five to seven stools a day, and that he saw blood intermittently. *Id*. Plaintiff's main complaint was right lower quadrant pain associated with bloating and usually relieved by passing gas or emesis. (AR 691). At that time, Plaintiff was taking Vicodin and had been given Percocet during an emergency room visit to use for breakthrough pain. *Id*. The treating physician increased Plaintiff's Humira dose, keeping the methotrexate dose the same. (AR 692).

On July 25, 2012, Plaintiff underwent another revision of his ileocolonic resection and anastomosis. (AR 848-49). On September 14, 2012, Plaintiff saw Dr. Fischer, his treating gastroenterologist, for follow up after the surgery. (AR 675). Dr. Fischer noted that Plaintiff restarted methotrexate on August 20, 2012, and also restarted him on Humira. Plaintiff reported feeling better after the surgery as he no longer had nausea or vomiting, but he continued to depend on pain medication. *Id*. He reported fatigue. (AR 676).

At a September 27, 2012 office visit with Centers for Pain Relief, Plaintiff rated his abdominal pain at that time as an eight on a scale of one to ten with the pain sometimes at a rating of ten. (AR 662). He described the pain as constant throughout the day with varying levels of severity and that it decreases with prescription medication. *Id*.

On April 13, 2013, Plaintiff was seen for follow up for his severe ileocolonic Crohn's disease. (AR 713). The doctor noted that Plaintiff resumed Humira and methotrexate following his last clinic visit but that Humira had been discontinued because of a skin infection. *Id.* Plaintiff reported six to ten semi-formed or liquid bowel movements a day. (AR 714).

On July 10, 2013, Dr. Fisher noted that Plaintiff was currently taking Humira and methotrexate, with past failure of Remicade and Cimiza, and a June 6, 2013 colonoscopy showed ongoing inflammation that appeared to be worse compared to the previous colonoscopy. (AR 708).

Plaintiff had also developed a minor anal stricture. *Id*. Biopsies confirmed chronic active colitis. *Id*. Plaintiff had ongoing abdominal pain, and Dr. Fischer noted that Plaintiff appeared fatigued. *Id*. Dr Fisher discontinued Humira but continued methotrexate. (AR 709). Dr. Fischer noted decreased appetite and nausea.

On October 9, 2013, Plaintiff's treatment regime for Crohn's disease was methotrexate, with a notation of past failed treatment including Remicade, Humira, and Cimzia. (AR 705). At that time, Plaintiff reported that he was having ten to twenty bowel movements a day, small in volume, loose, but no blood, associated with some central abdominal pain. *Id*.

On March 19, 2014, Plaintiff was seen for follow up for ileocolonic Crohn's disease. (AR 717). It was noted that he was not then currently on any medications. *Id*. The treatment record explains that Plaintiff was supposed to be prescribed methotextrate with a second medication but that he had not been taking the medicine since July 2013. *Id*. Plaintiff reported that the medications had been stolen from his house and that he was having social and home issues. *Id*. His main complaint that day was being fatigued all the time with some diffuse abdominal pain. *Id*. Plaintiff reported that he was taking prescribed narcotics for the pain. *Id*. He reported that his bowel movements were alternating between loose and sometimes watery. *Id*. He reported no blood or mucus in his stool. *Id*. In the past, Plaintiff was not responsive to Remicade, Humira, and Cimzia. *Id*. The doctor noted that it "seems methotrexate is not working as well, as when he was taking it, he does not think that it was helping." (AR 717). The doctor noted that Plaintiff was not a candidate for Tysabri. *Id*. Plaintiff's medications included morphine and Percocet. (AR 718). The doctor decided to wait to restart methotrexate at that time because Plaintiff seemed to have no response to

methotrexate. (AR 718). The doctor told Plaintiff that he would try a new medication in two months when it would be available on the market as a therapy. *Id*.

On March 28, 2014, Plaintiff was admitted to the hospital and treated with IV antibiotics, pain medications, and fluids for exacerbation of Crohn's disease with a diagnosis of acute-on-chronic abdominal pain. (AR 722, 733). At discharge, Plaintiff continued to have abdominal pain but no diarrhea. *Id*. Because Plaintiff had a prior urine screen that was positive for marijuana and amphetamines, the hospital could not continue to give him pain medications if he continued to use illicit drugs or alcohol. *Id*. The report notes that Plaintiff went outside of the hospital for "relaxation" and returned with a strong cigarette odor. *Id*. Plaintiff was discharged on April 2, 2014. *Id*.

On April 5, 2014, Plaintiff presented to the emergency room with a chief complaint of abdominal pain, reporting that he had recently been hospitalized with similar complaints and had been released a few days earlier. (AR 720). The report provides that Plaintiff had presented earlier in the evening at the emergency room but left against medical advice when he was not given pain medication immediately. *Id*.; *see also* (AR 728). Plaintiff reported that he had been given prednisone on discharge but stopped taking it because he thought it was giving him hiccups. (AR 720). Plaintiff reported that he was not taking any other medications for his Crohn's disease at that time. *Id*.

On April 8, 2014, Plaintiff presented to the emergency room with complaints of abdominal pain, nausea, and vomiting for the previous three weeks with the present onset of severe pain two days earlier. (AR 772-74). Plaintiff reported loose bowel movements with streaks of blood and a history of chronic diarrhea. (AR 774).

On April 30, 2014, Plaintiff presented to his treating physician for follow up and medication refill. (AR 1011). His history shows that the duration of an episode is the "majority of the day," that

nothing relieves his symptoms, and that an associated symptom is diarrhea. *Id*. Plaintiff reported diffuse abdominal pain. *Id*. It was noted that he had been in jail for six months without treatment for his Crohn's disease. *Id*. Plaintiff was given a prescription for morphine but was advised that any further pain management would be through Summit Pain Management. (AR 1013).

On November 26, 2014, Plaintiff was admitted to the hospital after presenting to the emergency room with severe abdominal pain. (AR 1081). He noted that he had abdominal pain for fourth months made worse when in the Noble County Jail for three months where he was not able to follow his normal diet and was required to eat food that exacerbates his symptoms. *Id*. He reported blood in his stool and that despite returning to his normal diet, the abdominal pain continued. *Id*. Plaintiff was not taking any medication for his Crohn's disease at that time. *Id*.

On December 17, 2014, Plaintiff was admitted to the hospital for observation related to abdominal pain. (AR 1072, 1075). He reported vomiting for the past month. (AR 1072). He reported chronic loose stools/diarrhea with some blood. *Id*. He reported that he was taking all of his medications. *Id*.

On July 12, 2015, Plaintiff was admitted to the hospital for acute Crohn's flare, intractable abdominal pain, and a history of Crohn's disease. (AR 992, 996, 1085). He reported increasing abdominal pain, increasing rectal bleeding, and nausea and vomiting for the previous month. (AR 996). Plaintiff also complained of fatigue and low energy. *Id*. The physician noted that "[h]e states that he has diarrhea all the time, but that is normal for him." *Id*. A colonoscopy was performed, showing inflammation. (AR 1085). The doctor had a lengthy discussion with Plaintiff about treatment going forward; it was decided that he would continue with prednisone as well as another week of the antibiotic Flagyl. *Id*. The doctor noted that Plaintiff had previously treated at Indiana

University Hospital gastroenterology center but that he had difficulty getting there. *Id*. The doctor also noted the mixed results of Plaintiff's use of biologic agents (e.g., Humira). (AR 1086). The doctors advised Plaintiff that a colostomy at that time could cause more harm than good and that Plaintiff should try to manage his pain by controlling his symptoms. (AR 998, 1086).

On January 26, 2016, Plaintiff presented to the emergency room with abdominal pain for three days. (AR 1032). Plaintiff reported vomiting sometimes with occasional small amount of blood. *Id*. Plaintiff also reported loose diarrheal stools with fair amount of blood. *Id*. On January 27, 2016, Plaintiff was transferred to a different hospital with complaints of abdominal pain, diarrhea, and exacerbation of Crohn's disease. (AR 1001). The doctor noted Plaintiff's significant history of surgery and that Plaintiff was noncompliant as he continued to smoke cigarettes. *Id*. The doctor also noted that Plaintiff had not continued to treat with Dr. Fischer at IU Medical Center because of transportation issues. *Id*. Plaintiff reported multiple diarrhea stools daily. *Id*. The doctor noted the past ineffective treatment with Humira, Remicade, Imuran, and methotrexate. *Id*. The doctor noted that Plaintiff was under the care of Dr. Hendrick for chronic pain. *Id*. After further discussion, Plaintiff agreed to try a long-term option of taking methotrexate along with Entyvio. (AR 1002). The doctor wrote that it "does not appear that the patient will require surgical intervention at present" but that the doctor would be available should a resection be needed. (AR 1004, 1123).

On February 8, 2016, Plaintiff presented to the emergency room because of a bicycle accident. (AR 1119). He reported that he had no abdominal complaints, no vomiting, and no diarrhea. *Id*. However, the list of "problems" included active Crohn's disease, abdominal pain, and chronic diarrhea. (AR 1020).

At the hearing on this appeal, Plaintiff testified that he did not improve after his surgery in 2006 and that he had not improved since his last surgery in 2012. (R 338). Plaintiff testified that some days are better than others. (AR 337). On bad days, he cannot get out of bed; on good days, he has to run back and forth to the bathroom. (AR 337, 339, 368). Plaintiff testified that on his worst days, he may be in the bathroom fifty times, which occurred several times a week since his last surgery. (AR 337). He stated that his abdominal pain level never drops below a five out of ten. (AR 339). At the time of the hearing, Plaintiff was taking prescription pain medication, over-the-counter antidiarrheal medication, and vitamins. (AR 342). He testified that lying "curled up in a ball" is his most comfortable position. (AR 351).

Plaintiff testified that he has not had a hard bowel movement since he was a child. (AR 365-66). He explained that he has to go to the bathroom within an hour of eating, sometimes before he even finishes eating, and that he spends at least ten to fifteen minutes in the bathroom. (AR 365). If he eats too much, he is in pain. *Id.* Plaintiff has several bowel movement accidents each month and must carry a change of clothes with him. (AR 350, 361-62). When he needs to use the bathroom, Plaintiff cannot wait. (AR 361). If Plaintiff goes to the store, he has to use the bathroom at least once. (AR 360). If he eats at a restaurant, he stays until he needs to use the bathroom; otherwise, he has to stop to use the bathroom on the way home. (AR 372).

Plaintiff testified that he had not followed up with the doctor for the new trial of methotrexate treatment because he could not get an appointment due to his insurance. (362-63). Plaintiff testified that he gets "fatigued real easy" and sleeps a lot, taking at least one nap daily. (AR 367). He explained that walking wears him out and that he can never be too far from a bathroom.

(AR 349). His nighttime sleep is affected in relation to the number of times he goes to the bathroom in the night, which means that he never gets a good night sleep. (AR 359).

An adult function report completed by Plaintiff's mother provides that Plaintiff does not do any of his former activities because of "frequent bathroom trips" and because of constant pain. (AR 534). In his own adult function report, Plaintiff explains that he does small jobs around the house that can be done with frequent breaks to use the restroom and that the jobs usually take "all day because of time I spend in bathroom." (AR 540).

## ANALYSIS

In the instant appeal Plaintiff argues that remand is required because the ALJ failed to account for Plaintiff's chronic diarrhea and fatigue in the residual functional capacity determination. Plaintiff also argues that the ALJ's consideration of Plaintiff's subjective symptoms is not supported by substantial evidence, further undermining the residual functional capacity analysis. Because the manner in which the ALJ considered Plaintiff's subjective symptoms is closely connected to his determination that the record does not support Plaintiff's allegations regarding diarrhea, the Court considers the arguments together. Remand is required in this case for the ALJ to make a determination regarding Plaintiff's need for bathroom breaks caused by his diarrhea and the effect of those breaks on Plaintiff's residual functional capacity.

The residual functional capacity ("RFC") is a measure of what an individual can do despite the limitations imposed by his impairments. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); 20 C.F.R. § 404.1545(a). The determination of a claimant's RFC is a legal decision rather than a medical one. 20 C.F.R. § 404.1527(e)(1); *Diaz*, 55 F.3d at 306 n.2. The RFC is an issue at steps four

and five of the sequential evaluation process and must be supported by substantial evidence. SSR 96-8p, 1996 WL 374184, *3 (July 2, 1996); *Clifford*, 227 F.3d at 870.

"RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing' basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p at *1. "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p, at *3. The relevant evidence includes medical history; medical signs and laboratory findings; the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available. *Id.* at *5. In arriving at an RFC, the ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." *Id.* The "ALJ must also consider the combined effects of all the claimant's impairments, even those that would not be considered severe in isolation." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *see also Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003).

In making a disability determination, the ALJ must consider a claimant's statements about his symptoms, such as pain, and how the symptoms affect his daily life and ability to work. *See* 20 C.F.R. § 404.1529(a); SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017). Subjective allegations of disabling symptoms alone cannot support a finding of disability. *Id.* The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)    The individual's daily activities;
(2)    Location, duration, frequency, and intensity of pain or other symptoms;

     (3)      Precipitating and aggravating factors;
     (4)      Type, dosage, effectiveness, and side effects of any medication;
     (5)      Treatment, other than medication, for relief of pain or other symptoms;
     (6)      Other measures taken to relieve pain or other symptoms;
     (7)      Other factors concerning functional limitations due to pain or other symptoms.

*See* 20 C.F.R. § 404.1529(c)(3); *see also* SSR 16-3p, 2017 WL 5180304, at * 3. The "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2017 WL 5180304, at *2.

In this case, the ALJ assigned Plaintiff an RFC for a restricted range of light work with a sit-stand option and postural limitations. (AR 259). Plaintiff argues that the RFC is incomplete because it fails to account for limitations caused by Plaintiff's chronic diarrhea and fatigue. Indeed, despite the ALJ's recognition that Plaintiff suffers from Crohn's disease, noting that Plaintiff has had "longstanding abdominal problems since his teenage years with multiple resections of the small bowel," (AR 261), the ALJ did not include any limitations in the RFC based on Plaintiff's need to frequently use the bathroom. Remand is required because the ALJ's reasons for discrediting Plaintiff's reports of frequent diarrhea are not supported by substantial evidence. Moreover, the ALJ did not make a finding that Plaintiff has *no* episodes of diarrhea; thus, the failure to make a finding as to the frequency of Plaintiff's need to take unscheduled bathroom breaks and how the chronic diarrhea impacts his residual functional capacity is a reversible error.

In his summary of Plaintiff's allegations, the ALJ noted that Plaintiff testified that "at worst he visits the bathroom fifty times a day mainly due to diarrhea." (AR 260). Then, after stating generally that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record," the ALJ found that the "treatment record does not corroborate the frequency of bowel

movements alleged." *Id*. Even if the ALJ believed that the record did not support Plaintiff's need to use the bathroom *fifty* times a day, the ALJ failed to discuss in this context the treatment records that repeatedly report Plaintiff suffering chronic diarrhea and needing to use the bathroom many times a day, up to ten to twenty times a day, as well as additional testimony by Plaintiff describing the effect of diarrhea on his daily life.

As set forth in the background above, Plaintiff complained of chronic diarrhea consistently throughout the treatment records, at times reporting to a treating source the need to use the bathroom ten to twenty times a day often with loose or watery stools. On February 29, 2012, before the alleged onset date for purposes of this application for benefits and before his July 2012 surgery, Plaintiff reported that he had an average of five to seven stools a day and that he saw blood intermittently. (AR 657). On April 13, 2013, after his onset date and after the July 2012 surgery, Plaintiff reported six to ten semi-formed or liquid bowel movements a day. (AR 714). On October 9, 2013, Plaintiff reported that, since his last clinic appointment he was having ten to twenty bowel movements a day, small in volume, loose, but no blood, associated with some central abdominal pain. (AR 705). On March 19, 2014, Plaintiff's main complaint that day was being fatigued all the time with some diffuse abdominal pain. (AR 717). On April 8, 2014, Plaintiff reported loose bowel movements with streaks of blood and a history of chronic diarrhea. (AR 774). On April 30, 2014, diarrhea was identified as an associated symptom of Plaintiff's Crohn's disease. (AR 1011). On November 26, 2014, Plaintiff reported blood in his stool and that, despite returning to his normal diet, the abdominal pain continued. (AR 1081). On December 17, 2014, Plaintiff reported chronic loose stools/diarrhea with some blood. (AR 1072). On July 12, 2015, Plaintiff's physician noted that "[h]e states that he has diarrhea all the time, but that is normal for him." (AR 996). On January 26, 2016,

Plaintiff reported loose diarrhea stools with a fair amount of blood, (AR 1032, 1001), and on January 27, 2016, Plaintiff reported multiple diarrhea stools daily, (AR 1032). The ALJ did not discuss any of this evidence, instead discrediting Plaintiff based on his testimony regarding his worst days.

At the hearing, Plaintiff testified that, on his worst days, he uses the bathroom fifty times a day, explaining that he moves between his bed and the bathroom. When he has urgency, he cannot wait to use the bathroom. Plaintiff testified that he has several accidents a month. If he goes out of the house to shop, Plaintiff has to use the bathroom at least once during the trip. He has to use the bathroom within an hour of eating. When doing household chores, Plaintiff has to take frequent bathroom breaks, which makes the tasks take longer. The ALJ did not discuss any of this testimony, which is consistent with the medical evidence of record and with Plaintiff's longitudinal reports to treating sources.

Next in his analysis of Plaintiff's complaints of diarrhea, the ALJ commented that Plaintiff's "doctors do not give a medical opinion in that regard reflecting the need to take several unscheduled bathroom breaks during the day." (AR 260). The lack of such an opinion is meaningless as none of Plaintiff's treating physicians give a medical source statement or a residual functional capacity analysis that would request such an opinion. As Plaintiff was not working during the relevant time, it is unclear why regular treatment records would offer an opinion on the need to take unscheduled bathroom breaks. In contrast, as cited above, the treating physicians note Plaintiff's consistent complaints of chronic diarrhea and use of the bathroom many times a day and do not express any incredulity in the records as to those reports by Plaintiff.

The ALJ then wrote, "In fact, the claimant denied experiencing abdominal pain and diarrhea on *multiple* occasions." (AR 260) (emphasis added) (citing Exs. B22F, p. 4 and 7 and B23F, p. 1).

In support, the ALJ cites only three pages of the record, and all three citations amount to the ALJ cherry picking evidence to support his reasoning while ignoring the bulk of the evidence that is favorable to the claimant. *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). The first citation is to a July 30, 2015 treatment record after a transition of care from an eight-day inpatient hospital admission for severe abdominal pain and bleeding and pus in Plaintiff's stool. (AR 1008). In the ROS (review of systems) section of the record under "gastrointestinal," the record provides: "Negative for abdominal pain, acid reflux symptoms, anorexia, abdominal bloating, dysphagia, clay-colored stools, constipation, diarrhea, heartburn, hematemesis, hematochezia, hemorrhoids, melena, nausea, change in stool caliber and vomiting." *Id.* However, in the examination notes in the same record, the doctor noted under gastrointestinal "moderate diffuse pain" and "guarding." (AR 1009). This treatment record follows an eight-day hospitalization for severe abdominal pain with bleeding and pus in the stool; presumably, Plaintiff experienced some relief from the hospital treatment, yet he was still experiencing gastrointestinal pain. It is unclear what meaning, if any, should be given to the listing under ROS in this record.

The second citation is to an April 30, 2015 treatment record (three months earlier than the first citation) with an identical format. (AR 1011). Under "ROS" for "gastrointestinal" is an almost identical list of "negative for" symptoms, including "diarrhea" but *not* abdominal pain, instead including in bold lettering "Positive for abdominal pain (diffuse; in jail for 6 months with no treatment for Crohn's)." *Id.*

The third record cited by the ALJ is the February 8, 2016 emergency department record when Plaintiff sought treatment for right-side pain due to a bicycle accident. (AR 1019). In the

18

"history of present illness" section, the record provides: "No other complaints at this time no abdominal complaints that he typically has because he has severe Crohn's. He has not had any vomiting not had any diarrhea nothing new on that end." *Id.* However, the ALJ fails to note that, in the same record, Plaintiff's medical history lists "Crohn's disease," "abdominal pain," and "chronic diarrhea," all of which are listed as "active." (AR 1020). In light of the frequent records in which Plaintiff reports diarrhea and abdominal pain, which the ALJ fails to discuss, this record for treatment for accident-related pain is insignificant. When considered as a whole, the record shows that Plaintiff reported symptoms more frequently than he denied them.

Next, the ALJ commented that Plaintiff's "bowel movements were described as healthy and occurring 2 to 3 times per day, to his satisfaction," citing one November 30, 2012 treatment record. (AR 260) (citing Exhibit B4F). Therein, Plaintiff reported that, since the July 2012 surgery, his "bowel movements are healthy," he only has two to three a day, and "they are formed." *Id*. However, this November 30, 2012 treatment record was prior to the alleged onset date. (AR 672). And, as set forth above, the records since Plaintiff's alleged onset day in January 2013 show that he reported episodes of diarrhea, that his condition had worsened, that medications were not effective, and that further surgery was not recommended.

The ALJ then found that the "record shows a history of consistent noncompliance with medical treatment including not taking his medications as prescribed and lack of follow up with his gastroenterologist, but no surgical intervention has been required since his last surgical procedure." (AR 260) (citing Exs. B4F, B8F, B20F, B23F, and B24F). Although administrative law judges are to consider a claimant's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed, they are prohibited from drawing inferences from a claimant's noncompliance

or failure to seek more treatment without first inquiring into and considering a claimant's explanation for such a failure. *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008); SSR 16-3p, 2017 WL 5180304, at *9 (Oct. 25, 2017) ("We will not find an individual's symptoms inconsistent with the evidence in the record [based on a failure to follow prescribed treatment that might improve symptoms] without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints."). For instance, some factors to consider are modification of lifestyle to minimize symptoms, an inability to afford treatment, advice from a medical source that there is no further effective treatment, and the side effects of medication. SSR 16-3p, at *9-10.

In this case, the ALJ did not consider the reasons in the record for Plaintiff's alleged noncompliance. First, Plaintiff repeatedly and consistently sought treatment for his Crohn's disease, which causes diarrhea, including emergency room visits and hospitalizations. SSR 16-3p, 2017 WL 5180304, at *9 ("Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent.").

Plaintiff had difficulty following up with his gastroenterologist in Indianapolis, Dr. Fischer, because he could not afford the transportation to get there. (AR 1001) ("He has been referred and treated by Dr. Monika Fischer, IU Medical Center, but he has been noncompliant with that followup due to extensive travel.") (1/27/2016); (AR 1119). Sometimes, Plaintiff reported difficulty affording medication. (AR 730, 1169). Some of his medications caused side effects or were ineffective, leading him to discontinue the medication. (AR 713, 720, 992). Also, at times, Plaintiff's physician

directed Plaintiff to stop taking medication. For example, on July 10, 2013, one of the dates cited by the ALJ to show noncompliance, Dr. Fischer took Plaintiff off both Humira and methotrexate because they were not helping him and Humira was exacerbating his condition. (AR 709, 717-18). Thus, the ALJ appears to have misinterpreted the March 19, 2014 treatment note, when the ALJ cited it in support of this statement: "He was supposed to be taking Methotrexate daily, but had not taken this medication since July 2013." (AR 260) (citing Ex. B7F, p. 1).

Also cited by the ALJ is a November 30, 2012 record, which is prior to the alleged onset date, in which Dr. Fischer noted that Plaintiff had stopped his methotrexate because he was experiencing worsening knee pain and that Plaintiff did not restart the Humira because of a misunderstanding by Plaintiff about insurance. (AR 672) (Ex. B4F). In the April 5, 2014 emergency room record cited by the ALJ, Plaintiff reported that he had stopped taking prednisone because he thought it was giving him hiccups, and he reported that he was not currently taking medication for his Crohn's disease. (AR 720) (Ex. B8F). In the July 12, 2015 treatment record with a new physician, cited by the ALJ, Plaintiff reported that he was on prednisone for a year and that he stated that he has "tried everything and nothing else works." (AR 992) (B20F). The ALJ cited generally Exhibit B23F, which is 66-page record; it appears that on page 14, Plaintiff reported on January 26, 2016, that he was off his medications for "some time." (AR 1032). Finally, Exhibit B24F cited by the ALJ is a 24-page record from Dupont Hospital for the time period of August 20, 2014, to July 21, 2015. Although noncompliance is a factor for the ALJ to consider, he must do so in the context of all the evidence and must consider the reasons for the alleged noncompliance. The ALJ did not do so.

As for the ALJ's comment that "no surgical intervention has been required since his last surgical procedure," (AR 260), Plaintiff's doctors discussed the possibility of a colostomy with him, but that they opined that surgery could cause more harm than good and arranged for outpatient pain management, (AR 1085). The fact that additional surgery was not required because of the associated risks does not impugn Plaintiff's repeated reports throughout the records of the need to frequently use the bathroom.

The next comment in the ALJ's consideration of Plaintiff's diarrhea is that "claimant also continued to smoke and eat hefty meals against his doctor's advice." (AR 260) (citing Ex. B20F, p.1). The ALJ correctly recited the doctor's note from the July 12, 2015 treatment record during a one-week hospitalization for Crohn's flare-up. (AR 992). Although this is a proper factor for the ALJ to consider, there is no evidence in the record that controlling his diet or quitting smoking would eliminate Plaintiff's uncontrollable diarrhea. Plaintiff testified that he had reduced his smoking to half a pack a day, that eating smaller meals helps with his symptoms but then he is fatigued, and that he tries to eat small meals to avoid the symptoms caused by larger meals.

Finally, the ALJ noted, "Despite his apparent abdominal pain at the hearing, the claimant adequately answered the undersigned's questions and did not seem to have significant concentration or attention problems." (AR 260). Although this observation goes to Plaintiff's ability to concentrate, it is irrelevant as to Plaintiff's need to take unscheduled bathroom breaks throughout the day.

The Court recognizes that, two pages later, in discussing Plaintiff's Crohn's disease, the ALJ commented on two of the reports of diarrhea from the treatment record. (AR 262). First, the ALJ noted that, in November 2014, Plaintiff was seen in the emergency room for abdominal pain with

some diarrhea and blood in his stool but then commented, "However, he had been incarcerated for three months and had not had his normal medication for Crohn's disease since then, and had just been released a few weeks ago." (AR 262). While it appears from a review of the medical records during that time that Plaintiff's symptoms were exacerbated by the lack of medication due to his incarceration, there is no indication in the record that he does not have diarrhea even when taking medication. Notably, by that time period, his treating physicians had determined that methotrexate was not effective. Finally, this record is from 2014, and Plaintiff continued to report diarrhea to his treating physicians over the subsequent two years.

Second, the ALJ noted Plaintiff's report in July 2015 of having ten to twenty bowel movements a day but then discredits that report: "However, he continued to eat rather hefty meals and continued to smoke despite being cautioned by multiple physicians that these habits exacerbate Crohn's disease." (AR 262) (citing Ex. B20F, p.1). This is the same record the ALJ cited while discussing Plaintiff's diarrhea, discussed above. Although that treatment record includes both pieces of information, the doctor does not discredit Plaintiff's reports as to the frequency of his bowel movements or indicate that if Plaintiff stopped smoking or ate lighter meals then he would no longer have diarrhea. (AR 992). Also, Plaintiff testified that he eats less in the summer and was prescribed THC pills to help with his appetite. (AR 354-55). Plaintiff testified that he tries to eat small meals four to five times a day but that on a bad day, he may only eat two times. (AR 364). He explained that he eats small meals because if he eats too much, he "ends up hurting real bad." (AR 365).

Later in the decision, the ALJ also considered the Third Party Function Report that was completed by Plaintiff's mother. (AR 263) (citing Ex. B3E). The ALJ found her report that Plaintiff spends most of his time in the bathroom and is always in pain inconsistent with reports of Plaintiff

riding his bicycle, shopping in stores, taking care of his daughters, and going for short walks. *Id*. (citing Exs. B3E, B4E). It is not clear how the report is inconsistent with Plaintiff's limited activities. Plaintiff testified that he rarely shops, and, when he does, he must use the bathroom at least once each time. (AR 360). There is no evidence that Plaintiff regularly rides his bicycle or that he does so for long periods of time uninterrupted by bathroom breaks. Plaintiff testified that his children do not currently live with him as they live with his mother, and it is not clear how caring for his children is inconsistent with the need to frequently use the bathroom. On remand, the ALJ is directed to clarify why Plaintiff's mother's report is inconsistent with the record. *See* SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006).

Regardless of the exact number of times Plaintiff has to use the bathroom a day, the substantial evidence of record indicates that Plaintiff suffers periods of time when he has many diarrhea bowel movements a day that require immediate attention. It was error for the ALJ not to consider the substantial evidence of record and then to neither include the need for frequent unscheduled bathroom breaks in the RFC or otherwise explain how the evidence of record does not require such a limitation. *See Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012) ("Although an ALJ need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion; in doing so, he may not ignore entire lines of contrary evidence." (citing *Denton*, 596 F.3d at 425; *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009); *Zurawski*, 245 F.3d at 888-89)).

The error is not harmless. The vocational expert testified that unpredictable breaks are not tolerated in the unskilled workplace. (AR 377-78). She explained that an unskilled worker must be on task for eighty-five percent of the workday. (AR 377). If the ALJ had accounted for Plaintiff's urgent and unpredictable need to use the restroom, the vocational expert may have testified that no

jobs would be available. The ALJ's failure to account in the RFC for some level of the need to use the bathroom because of diarrhea requires remand. *See McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) ("The ALJ must adequately discuss the issue and build an 'accurate and logical bridge from the evidence to his conclusion.'" (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003))).

Plaintiff also argue that the ALJ failed to account for Plaintiff's allegations of fatigue. There are references in the medical record to Plaintiff's complaints of fatigue related to Crohn's disease, although to a lesser degree than the need to use the bathroom. At the hearing, Plaintiff explained that when he eats smaller meals to avoid complications from the Crohn's disease, the result is that he becomes easily fatigued. As a result, he naps daily, with a nap lasting a couple of hours. (AR 367). On remand, the ALJ is directed to also consider Plaintiff's fatigue in determining the RFC.

Plaintiff makes two additional arguments regarding the sufficiency of the RFC. First, Plaintiff contends that it is unclear how the ALJ formulated the RFC. Indeed, the ALJ acknowledged the state agency reviewers' conclusion that there was insufficient evidence upon which to base an opinion regarding Plaintiff's RFC. (AR 263) (citing AR 410-16, 418-24). However, the only specific error Plaintiff identifies is with regard to Plaintiff's diarrhea and fatigue, which the Court has addressed above. Plaintiff has not identified any medical findings for which the ALJ determined the significance without the assistance of expert opinion. *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014).

Second, Plaintiff criticizes the ALJ for relying on the prior ALJ's conclusion that Plaintiff can perform light work and for doing so because the ALJ believed that there was "no worsening" of Plaintiff's Crohn's or osteoarthritis that is substantiated by the record. (AR 263). Plaintiff is

correct that the June 2013 colonoscopy, which occurred five months after the prior ALJ's decision, showed that Plaintiff's Crohn's disease had in fact worsened. (AR 708, 842). Moreover, not all of the evidence relied on by the prior ALJ is in the record. On remand, the ALJ is directed to identify the evidence of record, rather that citing to the prior ALJ's decision, for finding that Plaintiff is capable of performing a limited range of light work.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** the relief requested in the Social Security Opening Brief of Plaintiff [DE 17], **REVERSES** the final decision of the Commissioner of Social Security, and **REMANDS** this matter for further proceedings consistent with this Opinion and Order.

So ORDERED this 7th day of August, 2018.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT